# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

LASHAUNA RUSSELL,       :
*o/b/o* C.G.,           :
                         :
      **Plaintiff,**      :
                         :      **CIVIL ACTION FILE NO.**
**v.**                     :      **1:09-CV-01123-AJB**
                         :
MICHAEL J. ASTRUE,     :
*Commissioner of Social*   :
*Security Administration*,  :
                         :
      **Defendant.**     :

## <u>ORDER[1] AND MEMORANDUM OPINION</u>

Plaintiff, Lashauna Russell on behalf of C.G., ("Plaintiff"), brought this action pursuant to § 1631(c)(3) of the Social Security Act, 42 U.S.C. § 1383(c)(3), to obtain judicial review of the final decision of the Commissioner of the Social Security Administration ("the Commissioner") denying the application for Supplemental Security Income ("SSI") Benefits.   For the reasons stated below, the Court **REVERSES AND REMANDS** the Commissioner's final decision.

---

[1]     The parties have consented to the exercise of jurisdiction by the undersigned pursuant to 28 U.S.C. § 636(c) and FED. R. CIV. P. 73.  [*See* Dkt. Entries dated 5/28/2009].  Therefore, this Order constitutes a final Order of the Court.

## I.    PROCEDURAL HISTORY

Plaintiff initially filed an application for SSI benefits on March 8, 2005, alleging disability commencing on December 22, 1997, the date of his birth.[2]    [Record (hereinafter "R") 48-51].    Plaintiff's application was denied initially and on reconsideration.  [R23-24, 35-38, 41-44].  Plaintiff then requested a hearing before an Administrative Law Judge ("ALJ").  [R33].   An evidentiary hearing was held on March 26, 2008.  [R375-400].  Following the hearing, the ALJ issued an unfavorable decision on June 27, 2008.  [R9-22].  Plaintiff sought review of the ALJ's decision and submitted additional records for the Appeals Council to review.  [*See* R374A-374G].  The Appeals Council denied Plaintiff's request for review on January 29, 2009, rendering the ALJ's decision the final decision of the Commissioner.  [R2-5, 8].

Plaintiff then filed a civil action in this Court on March 26, 2009, seeking review of the Commissioner's final decision.  *LaShauna Russell o/b/o C.G. v. Michael J. Astrue*, Civil Action File No. 1:09-CV-01123-AJB.  [Doc. 2].   The answer and transcript were filed on December 1, 2009. [Docs. 13-14].  Plaintiff filed the initial

---

[2]    Although Plaintiff states that his disability commenced at the time of his birth, "[p]ayment of [SSI] benefits may not be made for any period that precedes the first month following the date on which the application is filed . . . ."  20 C.F.R. § 416.501.  As such, the relevant period for Plaintiff's disability claim began on March 8, 2005, when he filed his application.

2

brief on January 4, 2010, [Doc. 17], and the Commissioner filed a response on January 28, 2010, [Doc. 18].  Plaintiff did not file a reply brief.  [*See* Dkt.].  The undersigned held a hearing on March 5, 2010.  [*See* Doc. 19].  The matter is now before the Court upon the administrative record, oral argument, and the parties' pleadings and briefs and is ripe for review pursuant to 42 U.S.C. § 1383(c)(3) and 42 U.S.C. § 405(g).

## II.    STATEMENT OF FACTS

### A.    *Evidence before the ALJ*

#### 1.    *Administrative Records*

A March 10, 2005, disability report indicated that Plaintiff's asthma was his disabling illness.  This illness prevented him from running or doing other activities outside. [R73].  Plaintiff indicated that he had received treatment from Dr. Faull Trover from 1997 through 2005 and from the Newton General Hospital for this same period. [R73-74].  Plaintiff indicated that he was taking four medications for his asthma, none of which caused side effects - - Albuterol, Prednisone, Singulair Tab, and Singulair. [R74].  At the time of the disability report, Plaintiff had completed kindergarten and was attending elementary school.  [R76].  He had not been tested for behavioral problems and was not in special education classes.  [R76].

3

In a March 2005 Function Report, Plaintiff indicated that he sometimes had trouble seeing.  [R95].  He had no trouble with hearing and talking.  [R95-96]. Plaintiff's ability to communicate was limited because he could not deliver telephone messages, repeat stories, tell jokes accurately, explain why he did something, speak in complex sentences, and talk with family.  [R97].  Plaintiff was unsure whether his learning was limited because he could not: read, read letters, print letters, write in long hand, write simple stories, perform addition or subtraction, understand money, or tell time.  [R98].  Plaintiff's physical abilities were limited because he could not run, use roller skates, swim, or dress/undress dolls.  [R99].  Plaintiff's impairment prevented him from playing team sports, but he could make friends and get along with adults. [R100].  Plaintiff's impairment interfered with his ability to take a bath, wash his hair, hang up his clothes, help around the house, get to school on time, and accept criticism. [R101].  Plaintiff had problems working on arts and crafts projects.  [R102].

In an August 5, 2005, disability report – appeal form, Plaintiff listed four medications that he was taking for asthma - - Singulair, Flovent, Albuterol Sulfate, and Albuterol Inhaler.  [R59].  The Singulair made Plaintiff nervous while the Flovent increased Plaintiff's heart rate.  [*Id.*].  Plaintiff indicated that his illness made it difficult

4

for him to care for his daily needs and that he was more limited than his initial disability report.  [R60].

    2.    *Medical Records*

On December 28, 1997, Plaintiff went to the Newton General Hospital ("Newton Hospital") emergency room for stuffy nose and congestion. [R112].  He was diagnosed with a viral infection and instructed to take Tylenol for his fever and to see a doctor. [R114].

Plaintiff was seen by Dr. Faull Trover on December 29, 1997.  The doctor noted that Plaintiff was one week old and would be rechecked at one month.  [R314]. Dr. Trover  saw Plaintiff four times in February 1998 for diaper rash, congestion, cough, facial rash, and ear infections.  [R312-14].

Plaintiff returned to the Newton Hospital emergency room on March 2, 1998, with a head cold and "chocking with coughs." [R121].  Plaintiff was given antibiotics, and his mother was instructed on temperature control.  [R122-23].  Dr. Trover saw Plaintiff the following day and diagnosed Plaintiff with acute obstructive nasopharyngitis (inflammation of the nose and pharynx)[3] and diaper rash.  [R311].

─────────────────

    [3]    Unless otherwise noted, the Court has obtained definitions of medical terms, descriptions of medications, and other medical information from the various links at the Medline Plus website. *See* Medline Plus, http://medlineplus.gov.

5

Dr. Trover saw Plaintiff on March 12, 1998, for nasal congestion and a cough. He was diagnosed with acute pharyngitis and bronchitis. [R310]. Plaintiff presented with the same complaints and a low grade fever to Dr. Trover on March 23. Dr. Trover gave the same diagnosis of acute pharyngitis and bronchitis. [R309].

Plaintiff was seen at the Newton Hospital emergency room on March 24, 1998, because he was crying and would not sleep. [R131, 133]. The doctor's notes are largely illegible, but indicate that Plaintiff had severe diaper rash. [R131]. Plaintiff was given a prescription for his congestion. [R133].

Plaintiff went to Dr. Trover on May 4, 1998, because of wheezing and a cough. Plaintiff was diagnosed with bronchial asthma, bronchitis, and acute pharyngitis and prescribed Proventil nebulization treatment (a process by which a machine delivers medication that relaxes and opens air passages as a mist that can be inhaled). [R309]. One month later, Dr. Trover saw Plaintiff for nasal drainage, a cough, and wheezing at night. Dr. Trover diagnosed Plaintiff with acute pharyngitis and tracheobronchitis (inflammation of the trachea and bronchi), and noted that he would watch for central pneumonia. Plaintiff was told to elevate his head and chest, take Tylenol or Advil, take Zithromax (an antibiotic), and take Prednisolone liquid. [R308]. On July 30, 1998, Dr. Trover diagnosed Plaintiff with a right ear infection and bronchial asthma. [R307].

6

In August 1998, Plaintiff was seen at Newton Hospital for shortness of breath and a night cough. He was diagnosed with asthma, [R141], and he was discharged in stable condition. [*See* R144]. An x-ray revealed a normal chest film. [R148].

On September 10, 1998, Dr. Trover saw Plaintiff for ear pain, nasal drainage, and cough. Plaintiff was diagnosed with an acute right ear infection. [R307].

On September 23, 1998, Plaintiff went to Newton Hospital complaining of wheezing. [R149]. He was diagnosed with having an acute asthma episode. [R151]. An x-ray revealed pulmonary hypoinflation, but no acute abnormality. [R159].

On November 27, 1998, Plaintiff complained of wheezing, cough, and a rash at Dr. Trover's office. He was assessed with Reactive Airway Disease exacerbation and mild diaper rash for which he was prescribed medication. [R306].

Dr. Trover saw Plaintiff on January 22, 1999, for nasal drainage, cough, and low-grade fever. Plaintiff was diagnosed with acute tracheobronchitis, told to rest, take fluids, take Tylenol, and prescribed Azithromycin (antibiotic). [R306]. Plaintiff returned to Dr. Trover on February 16, 1999, with the same symptoms and was diagnosed with acute respiratory tract infection for which Plaintiff was given an antibiotic. [R305]. Dr. Ronald Eith saw Plaintiff on February 25, 1999, for a cough and congestion. Dr. Eith diagnosed Plaintiff with asthma and prescribed an antibiotic,

AO 72A
(Rev.8/8
2)

Prelone (a steroid)[4], and Proventil syrup.  [R305].  Dr. Trover diagnosed Plaintiff with tracheobronchitis on March 9, 1999, and prescribed rest, fluids, Tylenol, and an antibiotic.  [R304].  Plaintiff was again diagnosed with tracheobronchitis on June 1, 1999, July 26, 1999, August 11, and August 24,1999.  [R303-02].

On December 15, 1999, Dr. Trover diagnosed Plaintiff with an upper respiratory tract infection.  Thirteen days later he diagnosed Plaintiff with acute tracheobronchitis. [R301].  On February 3, 2000, Dr. Trover determined that Plaintiff had tracheobronchitis, and he diagnosed Plaintiff on February 25 with bronchial asthma and respiratory tract infection.  [R300].

On July 27, 2000, Plaintiff was seen for nasal drainage, cough, and a low grade fever, which led Dr. Trover to diagnose him with tracheobronchitis.  The next day Plaintiff was lethargic and had pain when he breathed.  Plaintiff was also wheezing. Dr. Trover diagnosed Plaintiff with "[b]ronchial asthma - acute exacerbation - mild." [R299].  Dr. Trover diagnosed Plaintiff on August 22, 2000, with tracheobronchitis after he presented with nasal drainage, cough, and low grade fever.

Plaintiff was seen on November 27, 2000, for low grade fever and cough. Dr. Trover determined that Plaintiff had bronchial asthma and tracheobronchitis.

_____

[4]    *See* Drugs.com, http://drugs.com/mtm/prelone.html.

8

[R298].  On January 5, 2001, Dr. Trover diagnosed Plaintiff with tracheobronchitis.

Plaintiff was not wheezing on this date.  [R297].

Plaintiff was seen at Newton Hospital because of cough/wheezing on May 11,

2001.  [R169].  Plaintiff was diagnosed with having an acute asthma episode.  [R171].

An x-ray of the chest was normal.  [R177].  Plaintiff was discharged the same day in

stable condition.  [R175].

Plaintiff returned to Newton Hospital on May 31, 2001, because of a knot on his

neck and a fever.  [R178].  The doctor's diagnosis is illegible, [R180], but Plaintiff was

discharged the same day, [R184].

Plaintiff went to Newton Hospital on July 11, 2001, because of asthma.  [R186].

Plaintiff had a sudden onset of coughing and wheezing that did not improve after home

treatment.  [R194].  An x-ray of the chest revealed possible lower lobe pneumonia, but

a neck x-ray found no irregularities.  [R198].  He was diagnosed with asthma

exacerbation and rule out pneumonia.  [*See* R188, R189].  Plaintiff was discharged the

next day in good and improved condition.  [R193].[5]

_____

[5]      The complete hospital records for Plaintiff's stay on July 11 and July 12,
2001, are in the record from R186 -R220.

AO 72A
(Rev.8/8
2)

Dr. Trover saw Plaintiff on March 6, 2002, for a low grade fever and cough. Plaintiff was diagnosed with tracheobronchitis with drainage. Plaintiff had no wheezing. [R296].

Plaintiff went to the Newton Hospital emergency room on April 13, 2002, because of upper back pain. [R225]. Plaintiff was discharged the same day and instructed to apply ice for 24 hours and then heat. He was also told to take Tylenol or Motrin. [R228].

Plaintiff was admitted to Newton Hospital on September 14, 2002, because of wheezing and difficulty breathing, *i.e.*, "[a]sthmatic exacerbation with respiratory distress." [R233, 240]. The medical note indicated that Plaintiff was admitted after he did not improve following treatment with steroids at the emergency room. The note indicated that Plaintiff did not get a lot of asthma attacks, but if he did, they would clear after home treatment. Besides this problem and bronchitis, "he has been a healthy boy." [R240]. The plan for treatment was to give Plaintiff oxygen, IV fluids, breathing treatments, and steroids. [R241]. Plaintiff was discharged on September 16, 2002. [R234].

Dr. Trover saw Plaintiff on January 26, 2004, for a cough and to refill medications. [R294].

10

Plaintiff returned to the Newton Hospital emergency room on February 16, 2004, because of a cough/congestion. [*See* R261, 264, 267]. Plaintiff was discharged and told in part to take Tylenol for the fever. [R266].

Plaintiff was seen at the Newton Hospital emergency room on July 11, 2004, because of shortness of breath. [R280]. Plaintiff received medication, which improved his breath sounds and decreased the dyspnea (difficulty in respiration). [R283]. He was discharged the same day. [R288].

Plaintiff went to Dr. Trover on September 16, 2004, because his asthma was acting up. Plaintiff was prescribed Singulair and Albuterol. [R293]. On October 22, 2004, Dr. Trover, prescribed Plaintiff medication for athlete's foot. On examination, Plaintiff's lungs were clear to auscultation (act of listening to sounds) bilaterally. [R292]. Dr. Trover diagnosed Plaintiff with acute sinusitis on November 9, 2004, after Plaintiff presented with a cough and sore throat. The neurologic examination indicated that Plaintiff was alert and had age appropriate mental status. Plaintiff's lungs were clear to auscultation bilaterally. [R291].

On January 26, 2005, Dr. Trover diagnosed Plaintiff with asthma after Plaintiff presented with a cough, rattling in his chest, and wheezing. Plaintiff's neurologic examination indicated that he was alert and had age appropriate mental status.

11

Plaintiff's lungs had coarse breath sounds and bilateral occasional expiratory wheezes. Plaintiff was started on Albuterol, Singulair, and a Flovent inhaler.  [R290].

On March 31, 2005, Plaintiff's eyesight was 20/40 for the right eye and 20/30 for the left eye.  [R315].

On April 12, 2005, a non-examining doctor whose name is illegible completed a Childhood Disability Form.  [R316-21].  The doctor indicated that Plaintiff's impairments of asthma and vision were severe but did not medically equal or functionally equal the listings.  [R316].  The doctor found that Plaintiff had no limitations in the domains of: acquiring and using information, attending and completing tasks, interacting and relating with others, moving about and manipulating objects, and caring for himself.  [R317-19].  The doctor found less than marked limitations in Plaintiff's health and physical well-being due to Plaintiff's asthma and vision.  [R319].

On June 11, 2005, Dr. Ramona Munnis completed the Childhood Disability Evaluation Form.  [R322-27].  Dr. Munnis made the same findings as the unidentified doctor in the April 12, 2005, form.  [*See* R322, 324, 327].  Dr. Munnis noted that her findings were based in part on the absence of evidence or reports of major ER visits and hospitalizations.  [R325].

12

Dr. Trover saw Plaintiff on July 27, 2005, after Plaintiff fell and hurt his hip. Dr. Trover's examination found that Plaintiff's lungs were clear to auscultation bilaterally and his mental status was age appropriate.  Dr. Trover determined that Plaintiff had a contusion on his arm and asthma.  [R330].

Plaintiff went to Dr. Trover on November 9, 2005, because of congestion.  An examination revealed that Plaintiff's lungs were clear to auscultation bilaterally and his mental status was age appropriate.  Dr. Trover diagnosed Plaintiff with asthma and started an Axmacort inhaler.  [R333].  On December 21, 2005, Plaintiff returned to Dr. Trover because of asthma problems and a cough.  Plaintiff's lungs had course breath sounds due to upper airway congestion.  Plaintiff was assessed with asthma and prescribed medication for nebulizations.  [R335].

Dr. Trover saw Plaintiff on March 8, 2006, because of a possible urinary tract infection.  Plaintiff's lungs were clear to auscultation and his mental status was age appropriate.  Dr. Trover diagnosed Plaintiff with cystitis (inflammation of the urinary bladder).  [R338].  On March 22, Plaintiff went to Dr. Trover complaining of wheezing and trouble with asthma.  Plaintiff's lungs were clear to auscultation and his mental status was age appropriate.  Dr. Trover diagnosed Plaintiff with asthma and started Plaintiff on an inhaler and Singulair.  [R340].

13

On May 5, 2006, Plaintiff apparently had an asthma attack at school and was instructed to take Plaintiff to the emergency room because the inhaler was not helping. [R341].

Plaintiff went to Dr. Trover on January 26, 2007, to have his asthma rechecked. Plaintiff complained of wheezing on Albuterol. Plaintiff's lungs were clear to auscultation, and his mental status was age appropriate. Dr. Trover diagnosed Plaintiff with asthma and started Albuterol premixed nebulization solution. [R342].

On January 10, 2008, Plaintiff went to Dr. Trover complaining of sneezing and shortness of breath. Plaintiff's lungs were clear to auscultation and his mental status was age appropriate. Plaintiff was assessed with asthma and started on an inhaler and Singulair. [R345]. Seven days later, Dr. Trover saw Plaintiff and assessed him with asthma and acute pharyngitis (inflammation of the pharynx). [R346].

*3.    School Records*

Plaintiff's third grade report card for the first three quarters of the 2007-2008 school term indicated that while his reading had improved, he was not meeting third grade reading standards. Also, his math scores were lower because he did not complete assignments. The report card also indicated that Plaintiff needed to keep working on his behavior to see even more improvement. [R108]. Plaintiff's teacher modified his

14

work in reading, language arts, and mathematics based on SST.[6]  For the first three quarters, Plaintiff's grades ranged as follows depending on the quarter: (1) 73-74 in reading; (2) 71-74 in language arts; (3) 65-68 in math; (4) 65-70 in social studies; (5) 75-90 in science/health; (6) needs improvement in handwriting; and (7) both needs improvement and progressing depending on the quarter in art, music, and physical education.  Finally, Plaintiff received the following evaluations for initiative and work: (1) successful for class participation and responding to adult guidance positively; (2) needs improvement for completing tasks on time, returning homework, demonstrating organizational skills, refraining from unnecessary talking, listening to directions, working independently, and following rules; and (3) progressing for respecting others and cooperating with others.  Overall, Plaintiff needed to improve his conduct.  [R109].

---

[6]   "SST" appears to be an acronym for Student Support Team.  *See* Ga. Dep't of Edu., Education Acronyms at 8, http://www.doe.k12.ga.us/_documents/doe/help/acronyms.pdf.  According to the Georgia Department of Education, "[t]he Student Support Team (SST) is a problem-solving process in every Georgia school.  Its purpose is to find ways around roadblocks to success for any student referred to it." *See* Ga. Dep't of Edu., Student Support Teams, http://www.doe.k12.ga.us/tss_learning.aspx?PageReq=TSSLearningSupport (last visited Sept. 8, 2010).

On March 23, 2005, a teacher, A. Pittman,[7] completed an "Asthma Questionnaire (to the Teacher)" form, indicating that Plaintiff showed symptoms of asthma at school and took medication at school.  Plaintiff was short of breath on cold, windy days.  He had good attendance during the 2004-2005 school year with only one absence and no tardies, and he had perfect attendance the previous school year.  The teacher indicated that Plaintiff's asthma did not affect Plaintiff's school performance, but he did have to miss some morning work for breathing treatments.  [R70].  Pittman noted that Plaintiff's behavior and functioning had not worsened and Plaintiff had not exhibited a change in behavior.  [R71].

B.     *Evidence Presented to the Appeals Council*

At the Appeals Council stage, Plaintiff submitted school discipline records for three events that occurred while Plaintiff was in the third grade in 2008.[8]   On September 26, 2008, Plaintiff was cited for inappropriate behavior and disobedience after he continued to yell, "someone's calling my name," banged on a desk, upended his chair, and crumbled and dropped his test on the floor while other children were

---

[7]     Pittman had known Plaintiff for two years and saw the child all day.

[8]     This was apparently Plaintiff's second time through the third grade. [*See* R392 (noting at March 2008 administrative hearing, which preceded the disciplinary reports by at least six months, that Plaintiff was in third grade)].

16

taking a test.  Plaintiff was suspended four days because of this conduct.  [R374D-374E].  On this same day, Plaintiff was cited for disobedience and threatening to bring a gun to school.  In this incident, Plaintiff said he would go to the pawn shop to get a gun and "kill" the people at the Board of Education because they kept changing principals.  Plaintiff also was yelling for his teacher to start his "time" and banging his hands and pencils on his desk.  [R374F].  On October 27, 2008, Plaintiff was suspended for three days after he hit a student in the eye who was pushed into him.  Plaintiff also threatened to beat the student up "for real" if Plaintiff was suspended.  [R374G].

> C.    *March 26, 2008, Administrative Hearing*

At the time of the hearing, Plaintiff was ten years old.  [R380].  Plaintiff's mother testified that Plaintiff's asthma was "pretty severe" because he could not play sports.  [R380, 389].  Plaintiff was not allowed to spend the night at other children's homes or hang out with other kids because of the asthma.  [R384].  Plaintiff's mother also supervised him when he played outside.  [R385].  Plaintiff could ride a bike.  [R389-90].  Plaintiff would sometimes participate in physical education at school and would sometimes watch.  If he got into trouble, the teacher would make Plaintiff run.  [R395-96].

17

Plaintiff's family had to move from an apartment to a house because of Plaintiff's asthma and had to remove the carpet from the house. [R385-86]. When Plaintiff would have an asthma attack, he was hooked up to a machine, which would usually calm him down. [R381]. Plaintiff suffered from asthma attacks three or four times a week, and he usually had to use his machine for two of these episodes. [R381-82]. Plaintiff's asthma sometimes affected his sleep. [R388].

Plaintiff's mother also testified that she had problems with Plaintiff's behavior. [R386]. Plaintiff apparently could not get along with certain types of children, and he did not stay on task all of the time. [R386-87]. Plaintiff did not get along with his nine year old brother, but he got along better with his 15 year old sister. [R389-90]. Also, Plaintiff was not good with chores. At school, Plaintiff was suspended five days for not following directions and for bothering other students. [R387]. Plaintiff testified that he also fought boys at school when they would bother or push him. [R395].

Plaintiff's grades were not good. [R388]. He repeated the second grade. [R390]. His mother also was informed that he would have to repeat the third grade if he did not pass a standardized test because his grades were not good enough. [R388]. The school also informed Plaintiff's mother that it would place Plaintiff in a smaller

18

class to see if that would help. [R390]. The school had not notified Plaintiff's mother that it recommended additional testing of Plaintiff. [R390-91].

## III.   ALJ'S FINDINGS OF FACT

On June 27, 2008, the ALJ made the following findings of fact and conclusions of law:

1.   The claimant was born on December 22, 1997. Therefore, he was a school-age child on March 1, 2005, the date the application was filed, and is currently a school-age child (20 CFR 416.926a(g)(2)).

2.   The claimant has not engaged in substantial gainful activity at any time relevant to this decision (20 CFR 416.924(b) and 416.972).

3.   The claimant has the following severe impairment: asthma (20 CFR 416.924(c)).

. . .

4.   The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.924, 416.925 and 416.926).

. . .

5.   The claimant does not have an impairment or combination of impairments that functionally equals the listings (20 CFR 416.924(d) and 416.926a).[9]

---

[9]   In making this finding, the ALJ concluded that Plaintiff had no limitations in: (1) acquiring and using information; (2) attending and completing tasks;

19

. . .

6.      The claimant has not been disabled, as defined in the Social
        Security Act, since March 1, 2005, the date the application was
        filed (20 CFR 416.924(a)).

[R15-22].

The ALJ explained that Plaintiff's asthma was severe, but there was no evidence that the asthma resulted in limitations of the level that would meet any of the Listings. [R16].  The ALJ further noted that the non-examining doctors' opinions were given considerable weight because they were consistent with the evidence.  [R17, 22].

As for the six domains of function, the ALJ found no limitations in five of the six domains.  [R18-22].  First, the ALJ found no limitations in acquiring and using information and attending and completing tasks because evidence showed that Plaintiff's school performance was unaffected by his asthma and the agency doctors found no limitations in this area. [R18-19].  Second, the ALJ determined that Plaintiff was not limited in interacting and relating with others because the 2007-2008 report card indicated that Plaintiff participated in class activities, his school attendance was good, and the agency doctors found no limitations.  [R19].  Third, the ALJ determined

_____

(3) interacting and relating with others; (4) moving about and manipulating objects; and (5) caring for himself; [R17-22].  Also, the ALJ found that Plaintiff had "less than marked limitation in health and physical well-being."  [R22].

20

that Plaintiff did not have limitations in caring for himself and moving and manipulating objects because the state doctors found no limitations in these areas. [R20-21].  Fourth, the ALJ determined that Plaintiff had less than marked limitations in his health and physical well-being because Plaintiff missed some school work from shortness of breath.  The ALJ indicated that Plaintiff's behavior, not his asthma, affected his school performance, and the ALJ added there was no evidence for learning or behavioral disabilities. [R22].  Since Plaintiff's impairment did not functionally equal a Listing, the ALJ determined that Plaintiff was not disabled.  [R15].

## IV.    STANDARD FOR DETERMINING DISABILITY

"An individual under the age of 18 shall be considered disabled . . . if that individual has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 1382c(a)(3)(C)(i); 20 C.F.R. § 416.906 (same).  The individual who seeks Social Security disability benefits must prove that he or she is disabled.   42 U.S.C. § 1382c(a)(H)(i) (rendering the provisions from 42 U.S.C. § 423(d)(5) applicable to SSI disability applications, which places burden on claimant to prove disability); *see also* 20 C.F.R. § 416.912(a).

21

"Federal regulations set forth the process by which the [Social Security Administration] determines if a child is disabled and thereby eligible for disability benefits." *Shinn ex rel. Shinn v. Commissioner*, 391 F.3d 1276, 1278-1279 (11th Cir. 2004). Under the regulations, this process begins with the Commissioner determining whether the child is "doing substantial gainful activity." If the child is performing substantial gainful activity, the child is considered "not disabled" and is ineligible for benefits. 20 C.F.R. § 416.924(a), (b).[10]

If the child is not engaged in substantial gainful activity, the Commissioner next considers whether the child's "physical or mental impairment(s)" alone or in combination with other impairments are severe. 20 C.F.R. § 416.924(a), (c). An impairment will be considered in a disability application only if it arises from "anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. § 416.908. Thus, an impairment "must be established by medical evidence." *Id.*; *see also* 20 C.F.R. § 416.913(a) ("[The Commissioner] need[s] evidence from acceptable medical sources to establish whether you have a medically determinable

––––––––––––––––––––

[10]     The summary of the evaluation process for childhood disability cases borrows heavily from the description in the Eleventh Circuit's decision in *Shinn ex rel. Shinn*, 391 F.3d at 1278-79.

22

impairment(s).").   In contrast, non-medical evidence, including the testimony of "[e]ducational personnel" and "parents and other caregivers, siblings, other relatives, friends, neighbors, and clergy," may be used to demonstrate that a child's impairment is severe.  20 C.F.R. §§ 416.913(d)(2), (4), 416.924a(a)(2).

If the child has a severe impairment or impairments, the Commissioner next assesses whether the impairment "causes marked and severe functional limitations" for the child.  20 C.F.R. §§ 416.911(b), 416.924(d).  Limitations arising from pain count in this determination.  20 C.F.R. § 416.924(a) ("[The ALJ] will also evaluate any limitations in your functioning that result from your symptoms, including pain.") (parenthetical omitted); *see also* 20 C.F.R. § 416.924a(b)(2) ("[Y]our symptoms (such as pain . . .) may limit your functioning.").  The Commissioner uses objective criteria listed in the Code of Federal Regulations ("C.F.R.") to determine whether the impairment causes severe and marked limitations.   "The C.F.R. contains a Listing of Impairments ["the Listings," found at 20 C.F.R. § 404 app.] specifying almost every sort of medical problem ("impairment") from which a person can suffer, sorted into general categories."   *Shinn ex rel. Shinn*, 391 F.3d at 1278 (citing 20 C.F.R. § 416.925(a)).  "For each impairment, the Listings discuss various limitations on a

23

person's abilities that [the] impairment may impose.  Limitations appearing in these listings are considered 'marked and severe.' "  *Id.*

A child's impairment will cause "marked and severe functional limitations" if those limitations "meet[ ], medically equal[ ], or functionally equal[ ] the [L]istings." 20 C.F.R. § 416.911(b)(1); *see also* §§ 416.902, 416.924(a).  The limitations "meet" a Listing if the child actually suffers from the limitations specified in the Listings for that child's severe impairment.  The limitations "medically equal" a Listing if the child's limitations "are at least of equal medical significance to those of a listed impairment."  20 C.F.R. § 416.926(a)(2).

Finally, if the limitations resulting from a child's particular impairment are not comparable to those specified in the Listings, the Commissioner examines whether the impairment is "functionally equivalent" to those in the Listings.  *Shinn ex rel. Shinn*, 391 F.3d at 1279.  To make this determination, the Commissioner examines the degree to which the child's limitations interfere with the child's normal life activities.  The C.F.R. specifies six major domains of life:

(i) Acquiring and using information;

(ii) Attending and completing tasks;

(iii) Interacting and relating with others;

24

(iv) Moving about and manipulating objects;

(v) Caring for [one]self; and

(vi) Health and physical well-being.

20 C.F.R. § 416.926a(b)(1).  The C.F.R. contains various "benchmarks" that children should have achieved by certain ages in each of these life domains.  *See* 20 C.F.R. §§ 416.926a(g)-(l).   A child's impairment is "of listing-level severity," and so "functionally equals the listings," if as a result of the limitations stemming from that impairment the child has "'marked' limitations in two of the domains [above], or an 'extreme' limitation in one domain." 20 C.F.R. § 416.926a(d); *see also* 20 C.F.R. § 416.925(a).

If the limitations stemming from a child's severe impairment meet, medically equal, or functionally equal the limitations specified in the Listings, the ALJ then examines whether the impairment "meets the duration requirement."   20 C.F.R. § 416.924(a).  An impairment meets this duration requirement if it "[is] expected to cause death or . . . has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. §§ 416.906, 416.909.

# V.    SCOPE OF JUDICIAL REVIEW

The scope of judicial review of a denial of Social Security benefits by the Commissioner is limited.  Judicial review of the administrative decision addresses three questions:  (1) whether the proper legal standards were applied; (2) whether there was substantial evidence to support the findings of fact; and (3) whether the findings of fact resolved the crucial issues.  *Fields v. Harris*, 498 F. Supp. 478, 488 (N.D. Ga. 1980).  This Court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner.   The findings of the Commissioner are conclusive if they are supported by substantial evidence and the Commissioner applies the correct legal standards.  *Lewis v. Callahan*, 125 F.3d 1436, 1439-40 (11th Cir. 1997); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987); *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986); *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983).  "Substantial evidence" means more than a scintilla, but less than a preponderance.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion and it must be enough to justify a refusal to direct a verdict were the case before a jury.  *Richardson v. Perales*, 402 U.S. 389 (1971); *Hillsman*, 804 F.2d at 1180; *Bloodsworth*, 703 F.2d

26

at 1239. "In determining whether substantial evidence exists, [the Court] must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [Commissioner's] decision." *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986). In contrast, review of the ALJ's application of legal principles is plenary. *Foote v. Chater*, 67 F.3d 1553, 1558 (11th Cir. 1995); *Walker*, 826 F.2d at 999.

## VI.   CLAIMS OF ERROR

Plaintiff claims that the Commissioner's final decision should be remanded because of the following three errors: (1) the ALJ failed to obtain a neuro-psychological evaluation following the administrative hearing; (2) the ALJ failed to consider all of Plaintiff's impairments in evaluating whether he was disabled along the six domains; and (3) the Appeals Council should have remanded the case based on the new evidence submitted to it.  [*See* Doc. 17].  The Court discusses each claim of error below.

### A.   *Neuro-Psychological Evaluation*

Plaintiff argues that the ALJ erred by failing to order an evaluation for Plaintiff's psychological issues. [Doc. 17 at 9-14].  Plaintiff asserts that since there was evidence of behavioral, psychological, and intellectual problems, the ALJ should have discussed the issue meaningfully in his opinion.  [*Id.* at 9].  Plaintiff contends that the record evidence of cognitive and behavioral problems triggered the ALJ's duty to order a

27

consultative psychiatric exam, citing *McCall v. Bowen*, 846 F.2d 1317, 1320 (11th Cir. 1988) and 42 U.S.C. § 421(h).  [*Id.* at 11-12].  Plaintiff points to the evidence of Plaintiff's 2007-2008 report card and the testimony of Plaintiff being held back a grade as evidence of a learning disability, which required the ALJ to order testing.  [*Id.* at 11-12].  Plaintiff then contends that the disciplinary records from September and October 2008 raise additional concerns that Plaintiff had a psychological impairment for which the ALJ should have sought an examination.[11]  [*Id.* at 13].

The Commissioner responds that the ALJ did not need to obtain a post-hearing neuropsychological evaluation.  [Doc. 18 at 4-6].  First, the Commissioner asserts that there is no evidence that the behavioral problems stem from a medically determinable impairment, and it is the claimant's job to prove the existence of such an impairment.  [*Id.* at 4-5].  The Commissioner notes that the medical records describe Plaintiff as cooperative and alert and there is no evidence of school testing.  [*Id.* at 5].  Second, the Commissioner contends that Plaintiff's reliance on *McCall*, 846 F.2d at 1320, is misplaced because there is no evidence of a medically determinable mental

---

[11]      As discussed in Part VI.C., *infra*, the September and October 2008 were not properly before the Commissioner because they are not material or relevant to the period on or before the ALJ's decision.  The Court discusses, however, these records in Part VI.A. as if they were properly presented.

AO 72A
(Rev.8/8
2)

impairment in the instant case.  [*Id.* at 5].  Third, the Commissioner asserts that Plaintiff's reliance on 42 U.S.C. § 421(h) is misguided because this provision speaks to state agency level determinations.  [*Id.* at 5-6].  Finally, the Commissioner argues that Plaintiff has not shown that this failure to develop the record prejudiced Plaintiff, which is essential in obtaining a remand for failure to develop the record.  [*Id.* at 6].

"[T]he ALJ has a duty to develop the record fully and fairly."  *See, e.g.*, *Wilson v. Apfel*, 179 F.3d 1276, 1278 (11th Cir. 1999); *see also* 20 C.F.R. § 416.912(d).  The Commissioner may order a consultative examination if a plaintiff's medical sources cannot or will not give the Commissioner sufficient medical evidence about an impairment to allow him to make a disability determination.  20 C.F.R. § 416.917.  A consultative examination will be ordered when, *inter alia*: (1) the evidence as a whole is insufficient to make a decision; (2) the additional evidence needed is not contained in the medical source's records; (3) highly technical or specialized medical evidence is needed and not available from another source; (4) a conflict, inconsistency, ambiguity, or insufficiency in the evidence must be resolved; and/or (5) there is a change in the claimant's condition that is likely to affect the child's functioning and the current severity of the impairment is not established.  20 C.F.R. § 416.919a(b).  In making this decision, the Commissioner considers the medical reports, the disability

AO 72A
(Rev.8/8
2)

interview form, and other record evidence.  *Id.* § 416.919a(a)(1).  A case will be remanded for failure to develop the record only if the plaintiff shows prejudice.  *See Robinson v. Astrue*, No. 09-12472, 2010 WL 582617, *2 (11th Cir. Feb. 19, 2010) (citing *Brown v. Shalala*, 44 F.3d 931, 935 (11th Cir. 1995)[12]).  Prejudice "at least requires a showing that the ALJ did not have all of the relevant evidence before him in the record . . . or that the ALJ did not consider all of the evidence in the record."  *Kelley v. Heckler*, 761 F.2d 1538, 1540 (11th Cir. 1985).

The Court concludes that the ALJ did not err in failing to order a consultative neuro-psychological evaluation.  It is Plaintiff's burden, not the Commissioner's, to establish a disability.  *See* 20 C.F.R. § 416.912(a).  To be disabled, a plaintiff must establish that he has medically determinable impairments through medical evidence.  *See id.* § 416.906, 416.912(c).  As a result, Plaintiff had the burden of establishing an impairment that would cause behavioral or cognitive limitations.  *See id.* § 416.912(c)

---

[12]    The undersigned notes that the published Eleventh Circuit cases that have required a showing of prejudice have been cases in which the plaintiff was unrepresented at the ALJ hearing.  *See Graham v. Apfel*, 129 F.3d 1420, 1421 (11th Cir. 1997) (noting that claimant appeared at ALJ hearing without an attorney); *Brown*, 44 F.3d at 932 (noting that claimant appeared *pro se* at ALJ hearing); *Kelley v. Heckler*, 761 F.2d 1538, 1539 (11th Cir. 1985) (noting that claimant waived right to counsel at the ALJ hearing).  If an unrepresented claimant needs to show prejudice to be entitled to a remand, then a represented claimant, like Plaintiff, would also necessarily need to demonstrate prejudice for failure to develop the record.

AO 72A
(Rev.8/8
2)

(placing burden on claimant to show how the impairment affects functioning).  Plaintiff did not meet this burden.  The medical records are devoid of any notes suggesting that Plaintiff had mental impairments.  As the Commissioner points out, Dr. Trover's examinations of Plaintiff's neurological functioning identified Plaintiff as alert and as having an age-appropriate mental status.  [*See* R290-91, 330, 335, 338, 340, 342].  The Newton Hospital records did not reference any concerns about Plaintiff suffering from mental impairments.  Also, there is no evidence in the record that Plaintiff even sought treatment for any mental impairments.  When Plaintiff's mother was asked whether the school recommended testing Plaintiff for his academic record, Plaintiff's mother indicated that she was unaware of any recommendations for this testing.  [R390-91; *see also* R76 (indicating that plaintiff was not in special education classes and had not been tested for behavioral problems)].  That Plaintiff presented evidence of poor academic performance and behavioral problems does not establish that some mental impairment caused these problems, thereby triggering the ALJ to seek a consultative exam.  Instead, the record evidence indicated that such an examination was not necessary given the absence of medical records indicating that Plaintiff suffered from a mental impairment.  As such, the record was sufficient, and the ALJ could make a decision without

31

AO 72A
(Rev.8/8
2)

obtaining a consultative examination.[13]  *See Sneed v. Barnhart*, 214 Fed. Appx. 883, 886 (11th Cir. Dec. 22, 2006) (holding that ALJ was not required to order psychological examination where (1) Plaintiff testified that she was tearful and taking antidepressants and (2) medical evidence revealed that plaintiff was taking an anti-anxiety drug and had a fair prognosis for depression).

Plaintiff claims that the Eleventh Circuit's *McCall* decision requires a different conclusion, but the Court is unpersuaded.  In *McCall*, the plaintiff initially sought

---

[13]     The Court recognizes that Plaintiff's argument has some support in the Commissioner's Social Security Ruling ("SSR") 09-2p, which Plaintiff did not cite in his brief, but which states in relevant part:

> [A] child who is having significant but unexplained problems may have an impairment(s) that has not yet been diagnosed, or may have a diagnosed impairment(s) for which we lack evidence. For example, children who are many grades behind in school often have a medically determinable impairment(s).  In many cases, the school will have evaluated the child, and the school records will provide information about whether there is a medically determinable impairment(s).[ ]  *It may be necessary to* further develop information from the child's medical source(s) or *purchase a consultative examination (CE)*. Adjudicators should pursue indications that an impairment(s) may be present if that fact may be material to the determination or decision.

SSR 09-2p (emphasis added).  The Court concludes for the reasons discussed in the main text that Plaintiff's failure to pursue a claim for a mental impairment and hence notify the ALJ that he was seeking disability for a mental impairment renders his argument unpersuasive that the ALJ is at fault for not ordering a consultative exam.

AO 72A
(Rev.8/8
2)

disability benefits due to physical impairments (arthritis and back and heart problems), but there was also medical evidence from physicians who "at times suggested that [plaintiff] might be suffering from a psychological condition."  *McCall*, 846 F.2d at 1318, 1320.  The Eleventh Circuit remanded the case because: (1) it concluded that remand was needed on another issue; and (2) the evidence of mental impairments might have required a psychological consultative exam under 42 U.S.C. § 421(h).  *Id.* at 1320. *McCall* does not require the ALJ in this case to order a consultative examination for four reasons.

First, the facts of *McCall* are distinguishable.  In *McCall*, the plaintiff's doctors suggested that Plaintiff suffered from mental impairments and prescribed medications to alleviate these impairments, but there is no similar record evidence in this case.  No medical professional ever suggested that Plaintiff suffered from psychological problems, and Dr. Trover's notes found Plaintiff's mental status to be "age appropriate."  Second, it is not clear that the *McCall* decision would have remanded the case solely on the basis of the ALJ's failure to order a psychological examination given that the *McCall* case stressed that remand was necessary on another issue.  *See McCall*, 846 F.2d at 1320 ("Certainly, since the case has to be remanded for proper handling of the overweight problem, the applicability of section 421(h) must be carefully

AO 72A
(Rev.8/8
2)

considered.").  Third, the *McCall* decision did not explicitly find that the ALJ erred in

opting not to order an examination, only that the Commissioner should "carefully

consider[]" whether to order an examination under § 421(h).  *McCall*, 846 F.2d at 1320.

With even less evidence of a mental impairment (none of which is from a medical

professional) and no other reversible errors in this case, the *McCall* case certainly does

not require remand in this case.  Finally, the *McCall* decision, which relied on

42 U.S.C. § 421(h),[14] appears to have misconstrued § 421(h) because the Eleventh

Circuit has since indicated that § 421(h) does not apply to cases heard by the ALJ.

*Sneed*, 214 Fed. Appx. at 886 (citing *Plummer v. Apfel*, 186 F.3d 422, 433 (3d Cir.

1999)).[15]    For these four reasons, the Court is unpersuaded by Plaintiff's

---

[14]    The statute providing for SSI benefits has incorporated § 421(h).  *See* 42 U.S.C. § 1382c(a)(3)(H)(i) ("In making determinations with respect to disability under this subchapter, the provisions of *sections 421(h)*, 421(k), and 423(d)(5) of this title shall apply in the same manner as they apply to determinations of disability under subchapter II of this chapter.") (emphasis added).

[15]    Also, the text of 42 U.S.C. § 421(h) indicates that it does not apply to cases in which the ALJ reviews a state agency decision at a claimant's request.  Section 421(h) states:

An initial determination under subsection (a),(c), (g), or (i) of this section that an individual is not under a disability, in any case where there is evidence which indicates the existence of a mental impairment, shall be made only if the Commissioner of Social Security has made every reasonable effort to ensure that a qualified psychiatrist or psychologist has

34

_____

> completed the medical portion of the case review and any applicable residual functional capacity assessment.

42 U.S.C. § 421(h).  By its terms, § 421(h) applies to determinations made under § 421(a), § 421(c), § 421(g), and § 421(i).  Section 421(a) applies to disability determinations made by a State Agency, so § 421(h) does not reach place a duty on the ALJ by way of § 421(a).  Although § 421(c) applies to cases reviewed by the Commissioner, the provision applies when the Commissioner decides to review a state agency decision "on its own motion" 421(c)(1) or when the Commissioner is exercising his statutory duty to ensure that state agency decisions are being decided accurately, § 421(c)(3).  The Commissioner was reviewing Plaintiff's case because Plaintiff requested this review pursuant to 42 U.S.C. § 421(d), not as part of the Commissioner's statutory oversight authority outlined in § 421(c).  As a result, § 421(h) does not govern the ALJ's conduct by way of § 421(c).  Section 421(g) applies to cases in which the Commissioner makes a disability finding, but only when there is no state agency process for determining Social Security disability cases.  Here, there is a state agency process for making disability determinations, so § 421(h) cannot apply to the ALJ who evaluated Plaintiff's claims through § 421(g).  Finally, § 421(i) applies to cases where an individual has already been found disabled.  Plaintiff has never been found disabled, so § 421(h) cannot apply to Plaintiff's case through § 421(i).  This discussion demonstrates that the requirement under § 421(h) applies to situations distinct from this case.  Instead, the Commissioner was reviewing Plaintiff's case pursuant to § 421(d), which states:

> Any individual dissatisfied with any determination under subsection (a), (b), (c), or (g) of this section shall be entitled to a hearing thereon by the Commissioner of Social Security to the same extent as is provided in section 405(b) of this title with respect to decisions of the Commissioner of Social Security, and to judicial review of the Commissioner's final decision after such hearing as is provided in section 405(g) of this title.

42 U.S.C. § 421(d).  Section 421(h) did not refer to § 421(d) and therefore does not require the ALJ in Plaintiff's case to ensure that a psychologist or psychiatrist to reviews a plaintiff's case even if there was evidence indicating the existence of a mental

reliance on *McCall*.[16]

_____

impairment.  Since Plaintiff sought review by the Commissioner under § 421(d) and § 421(h) does not apply to subsection (d), the Court concludes that § 421(h) has no application to a case being reviewed by an ALJ at a claimant's behest.  This conclusion is supported by other courts.  *See Plummer v. Apfel*, 186 F.3d 422, 433 (3d Cir. 1999) ("Because 42 U.S.C. § 421(d), which covers hearings before an ALJ, is excluded from § 421(h)'s purview, an ALJ is not required to employ the assistance of a qualified psychiatrist or psychologist in making an initial determination of mental impairment."); *Doughtery v. Astrue*, --- F. Supp. 2d ----, ----, 2010 WL 1849379, *11 (D. Del. May 7, 2010); *Harris v. Astrue*, No. 06-cv-7309, 2008 WL 2852248, *4 n.10 (C.D. Cal. July 23, 2008).

[16]    At oral argument before the Court, Plaintiff pointed to two regulations to support his consultative examination argument: 20 C.F.R. § 416.919a(5), and 20 C.F.R. § 416.924a(a).  Neither regulatory provision requires a consultative examination. Section 416.919a(5) states that a consultative examination "will normally" be required when "[t]here is an indication of a change in [claimant's] condition that is likely to affect . . . [the child's] functioning, but the current severity of [the claimant's] impairment is not established."  Plaintiff never established that he had a mental impairment, so there was no need to establish the severity of a non-diagnosed impairment.   Also, the documents that Plaintiff claims to evidence a change of condition - - the school disciplinary records - - were not before the ALJ and were not properly presented to the Appeals Council as discussed in Part VI.C., *infra*.

Section 416.924a(a)(2) states in relevant part that the Commissioner will consult parents and school records because they "can tell [the Commissioner] about the effects of [the claimant's] impairments on [the claimant's] activities and how [the claimant] function[s] on a day-to-day basis.  *Id.* § 416.924a(a)(2)(i) (parents), (2)(iii) (school). This regulation does not provide that these sources can provide a basis for an ALJ to seek a consultative examination.  Also, as discussed in the main text, the circumstances of this case did not require a consultative examination.

36

Even if the evidence of behavioral problems and poor grades suggested that Plaintiff had a mental impairment, this did not place the burden on the ALJ to investigate the existence of a mental impairment. Plaintiff never suggested at the administrative level that he was seeking disability on the grounds that he suffered from a mental impairment. Plaintiff's disability application and administrative filings never sought disability on any grounds other than asthma and perhaps vision. [*See* R73, 95]. At the hearing, Plaintiff's counsel did not inform the ALJ that Plaintiff was seeking to add a mental impairment as the basis for disability.

The Court recognizes that Plaintiff's mother testified at the hearing about having a "problem" with Plaintiff's behavior, but this testimony did not place the ALJ on notice that Plaintiff was seeking disability due to a mental impairment or even that had severe behavioral problems. Instead, Plaintiff's mother's testimony identified the behavioral problems as not getting along with other kids, not performing tasks, not performing chores satisfactorily, and being suspended once for not following rules. [R387]. These behaviors are unremarkable, and do not suggest the existence of a mental impairment. The Court reaches a similar conclusion concerning Plaintiff's academic problems. Although evidence indicated that Plaintiff repeated the second grade and was in danger of repeating the third grade, [R390], Plaintiff's mother

37

indicated that the school never brought testing Plaintiff to her attention when the ALJ asked about Plaintiff's academic problems.   [R390-91].   As a result, the hearing testimony did not somehow notify the ALJ that he needed a consultative exam to explore whether Plaintiff's academic or behavioral problems arose from a mental impairment.

Without notifying the ALJ that Plaintiff's disability claim was also premised on a mental impairment, Plaintiff cannot blame the ALJ for failing to obtain a medical examination to determine whether Plaintiff suffered from potential mental impairments. *See Robinson v. Astrue*, No. 09-12472, 2010 WL 582617, *2 (11th Cir. Feb. 19, 2010) (holding that the ALJ had no duty to consider impairment where neither plaintiff's disability application nor plaintiff's attorney at the hearing suggested that she was disabled based on the impairment); *Castillo v. Astrue*, No. 1:09-cv-864, 2010 WL 2179881, *4 (M.D. Ala. May 27, 2010) (holding ALJ had no duty to evaluate visual acuity where it was not a basis for disability either in the application or in the testimony); *Hale v. Astrue*, No. 5:07-cv-103, 2009 WL 742760, *10 (S.D. Ga. Mar. 20, 2009) ("The Commissioner can not be expected to address every minor alleged impairment[.]"); *Carter v. Astrue*, No. 7:07-cv-148, 2008 WL 4498960, *3 (M.D. Ga. Sept. 30, 2008) ("Merely noting the existence of an impairment does not make it a

38

condition the Commissioner must analyze."); *see also Pena v. Chater*, 76 F.3d 906, 909 (8th Cir. 1996) ("The [ALJ] is under no 'obligation to investigate a claim not presented at the time of the application for benefits and not offered at the hearing as a basis for disability.' ") (quoting *Brockman v. Sullivan*, 987 F.2d 1344, 1348 (8th Cir. 1993)); *Watson v. Astrue*, No. 08-cv-1523, 2010 WL 1645060, *3-4 (S.D.N.Y. Apr. 22, 2010).

Accordingly, the Court concludes that the ALJ **DID NOT ERR** in failing to order a neuro-psychological examination.

B.      *Evaluation of Plaintiff's Impairments*

Plaintiff argues that the ALJ's decision is incomplete because it did not consider his psychological impairments in evaluating the six domains of functioning and it did not adequately consider limitations from Plaintiff's asthma.  [Doc. 17 at 14-17].  First, Plaintiff argues that substantial evidence does not support the ALJ's conclusion that Plaintiff had no limitations in (1) acquiring and using information and (2) attending and completing tasks because the ALJ failed to consider that Plaintiff was held back twice in school, was performing poorly in school, and had behavioral difficulties in school. [*Id.* at 15]. Second, Plaintiff complains that substantial evidence does not support the ALJ's finding that the claimant had no limitations in interacting and relating with others because his report card indicated that he needed to improve in a number of behavioral

39

areas and the ALJ did not consider these problems.  [*Id.*].  Third, Plaintiff asserts that the ALJ ignored Plaintiff's breathing difficulties and testimony about his asthma interfering with activities when the ALJ determined that Plaintiff was not limited in moving about and manipulating objects.  [*Id.* at 16].  Fourth, Plaintiff asserts that the finding that Plaintiff had less than marked limitation in health and physical well-being ignores: (1) the medical history and mother's testimony about asthma; and (2) the evidence of Plaintiff's behavior affecting his learning   [*Id.*].  Finally, Plaintiff complains that the ALJ did not consider Plaintiff's psychological condition in combination with the other impairments.  [*Id.* at 17].

The Commissioner responds that Plaintiff's argument must fail because he has not established the existence of a medically determinable impairment.  [Doc. 18 at 7, 9].  The Commissioner contends that Plaintiff was not treated or diagnosed with any medically determinable mental impairment.   [*Id.* at 9].   The Commissioner acknowledges that there is evidence of behavioral problems, but asserts that this evidence cannot establish a medically determinable mental impairment.  [*Id.* at 9-10].  The Commissioner therefore argues that the ALJ did not err by failing to consider Plaintiff's behavioral problems in examining the six domains.  [*Id.* at 10].

40

Additionally, the Commissioner argues that substantial evidence supports the ALJ's decision that Plaintiff had less than marked limitation in the domain of health and physical well-being and no limitation in moving about. [*Id.*]. As for Plaintiff's physical well being, the Commissioner points to: (1) the teacher's asthma questionnaire responses, (2) another teacher's failure to mention that the asthma interfered with school performance, (3) Plaintiff's testimony that he participated in his physical education class, and (4) the lack of evidence of major hospitalizations. [*Id.* at 11-12]. As for Plaintiff's interactions with others, the Commissioner notes that the state agency doctors found no limitations, Plaintiff's mother indicated that Plaintiff had friends and generally got along with others, and Plaintiff testified that he had friends. [*Id.* at 12]. As for Plaintiff's ability to move about and manipulate objects, the Commissioner points to the state agency doctor opinions and Plaintiff's mother's statements about his activities. [*Id.* at 12-13].

A child will be disabled if he has "a medically determinable physical or mental impairment or combination of impairments that causes marked and severe functional limitations." 20 C.F.R. § 416.906. "A physical or mental impairment must be

41

established by medical evidence consisting of signs,[17] symptoms,[18] and laboratory findings.[19]" *Id.* § 416.908.  The plaintiff must provide medical evidence showing that he has an impairment and how the impairment affects his functioning.  *Id.* § 416.912(c). The Commissioner requires evidence from acceptable medical sources to establish that a plaintiff has a medically determinable impairment.  *Id.* § 416.913(a); *see also Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1160 (11th Cir. 2004) (holding that opinion of an individual who was not an acceptable source cannot establish the existence of an impairment).  Although the Commissioner considers a plaintiff's

---

[17]       Signs are anatomical, physiological, or psychological abnormalities that can be observed.  They "must be shown by medically acceptable clinical diagnostic techniques.  Psychiatric signs are medically demonstrable phenomena that indicate specific psychological abnormalities, e.g., abnormalities of behavior, mood, thought, memory, orientation, development, or perception."  Signs must "be shown by observable facts that can be medically described and evaluated."  20 C.F.R. § 416.928(b).

[18]       Symptoms in child disability cases are the child's descriptions of his impairment or the descriptions of a person who is most familiar with the child. Statements alone are insufficient to establish the existence of an impairment. 20 C.F.R. § 416.928(a).

[19]       Laboratory findings are "psychological phenomena which can be shown by the use of medically acceptable laboratory diagnostic techniques" such as psychological testing.  20 C.F.R. § 416.929(c).

AO 72A
(Rev.8/8
2)

functioning, the plaintiff's limitations in functioning "*must* result from [his] medically determinable impairment(s)." *Id.* § 416.924a(b)(2).

A child will be considered disabled if the ALJ finds that limitations resulting from a child's impairment are functionally equivalent to those in the Listings. *Shinn ex rel. Shinn*, 391 F.3d at 1279. The ALJ makes this determination by considering how the child's limitations (stemming from impairments) interfere with the child's normal life activities that are categorized in six domains of functioning. *Id.* The six domains are: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for himself; and (6) health and physical well-being. 20 C.F.R. § 416.926a(b)(1)(i)-(vi). A child will be found disabled if he has marked limitations in two of these domains or an extreme limitation in one of these domains. *Id.* § 416.926a(d). It is the ALJ's responsibility to determine functional equivalence along these domains. *Id.* § 416.926a(n).

The Court concludes that the ALJ (1) did not err by failing to examine limitations from mental impairments along any of the domains of functioning, (2) did not err in evaluating the general health and well being domain, but (3) did err in his examination of the moving about domain. First, Plaintiff's arguments that the Commissioner needed

43

to consider Plaintiff's alleged psychological impairment and the behavioral and learning limitations stemming from such an impairment are misplaced. There is no evidence from an acceptable medical source that Plaintiff suffered from any mental impairments. Plaintiff infers from his school performance and behavioral problems that this is evidence of a mental impairment. The regulations require, however, that an acceptable medical source make the determination about whether a plaintiff suffers from an impairment. *See* 20 C.F.R. § 416.913(a). As a result, Plaintiff, his mother, his attorney, and the Court cannot infer that a mental impairment exists based on behavioral and learning problems. Without a diagnosis from an acceptable medical source, the ALJ was not required to consider limitations in behavior or school performance in the domains of acquiring and using information, attending and completing tasks, interacting and relating with others, or health and physical well being because the limitations in behavior and school performance were not tied to any medically determinable impairment. *See* 20 C.F.R. § 416.924a(b)(2) ("Your limitations in functioning must result from your medically determinable impairment(s)."); *id.* § 416.926a(g)(3), (h)(3), (i)(3), (j)(3), (k)(3), (l)(3), (4) ("As in any case, your limitations must result from your medically determinable impairment(s)."); SSR 09-8p (indicating that the Commission does "not consider a limitation in [any domain] . . .

44

unless it results from a medically determinable impairment(s)").  There is no evidence that Plaintiff's asthma caused problems with school performance or his behavior.  [*See* R70-71 (noting that asthma did not affect school performance and plaintiff's behavior had not worsened)].  Without a connection to asthma or a medically diagnosed mental impairment, Plaintiff has not tied the learning and behavioral limitations to any impairment.  As a result, the ALJ was under no obligation to consider learning and behavioral limitations in the six domains of functioning that were unrelated to any diagnosed impairment.  *See* 20 C.F.R. § 416.924a(b)(2); *see also Veal v. Astrue*, Civil No. 07-436, 2008 WL 4449510, *4 (S.D. Ill. Sept. 28, 2008) (concluding that ALJ did not err in ignoring testimony about plaintiff's sensitivity to light because plaintiff in part "failed to show the required link to a medical impairment").

Second, the Court is unpersuaded by Plaintiff's argument that the ALJ committed error in evaluating the effect of Plaintiff's asthma on the domain of health and physical well being, but the Court finds that the ALJ erred in evaluating the effect of Plaintiff's asthma on the domain of moving about.  Each domain is discussed separately below.

Starting with the domain of health and physical well-being, the Court finds that the ALJ did not err in concluding that Plaintiff had less than marked limitations in his health and physical well-being.  The health and physical well being domain

45

"consider[s] the cumulative physical effects of physical or mental impairments and their associated treatments or therapies on [the plaintiff's] functioning that [was] not consider[ed]" when evaluating the plaintiff's ability to move about.  *See* 20 C.F.R. § 416.926a(l) (stating that the ALJ "consider[s] the cumulative physical effects of physical or mental impairments and their associated treatments or therapies on [claimant's] function that [were] not consider[ed] in paragraph (j) of this section," *i.e.* the section that pertains to the manipulating objects and moving about domain).  The Commissioner explains that "this domain does not address typical development and functioning," but instead "addresses how such things as recurrent illness, the side effects of medication, and the need for ongoing treatment affect a child's body." SSR 09-8p.[20]

    In evaluating this domain, the Commissioner considers whether the impairment limits a plaintiff's ability to perform activities independently or effectively when: (1) it causes reduced stamina or shortness of breath, *id.* § 416.926a(l)(1); (2) it causes the

---

[20]    "Social Security Rulings are agency rulings published under the authority of the Commissioner of Social Security and are binding on all components of the Administration."  *Sullivan v. Zebley*, 493 U.S. 521, 530 n.9 (1990) (internal quotation marks omitted); *see also* 20 C.F.R. § 402.35(b)(1).  "These rulings are not binding, however, on the federal courts, [ ] but they are entitled to deference."  *Holmes v. Astrue*, No. 1:09-cv-1523, 2010 WL 2196600, *13 n.9 (N.D. Ga. May 27, 2010) (citing *Fair v. Shalala*, 37 F.3d 1466, 1469 (11th Cir. 1994)).

46

plaintiff to take medications that limit performance of activities, *id.* § 416.926a(l)(2); and/or (3) it leads to periods of worsening, *id.* § 416.926(l)(3).  Examples of limitations that are considered in this domain include: (1) generalized symptoms such as lethargy; (2) somatic complaints related to impairments; (3) limitations in physical functioning because of treatment (such as nebulizer treatments); and (4) exacerbations from the impairment that interfere with physical functioning.[21]  *Id.* § 416.926a(l)(4).

Substantial evidence supports the ALJ's decision that Plaintiff had less than marked restrictions in the domain of health and physical well being.  First, the asthma questionnaire noted that Plaintiff did not miss any days of school because of his asthma. [R70].  Second, Plaintiff's report card did not tie his learning problems to his asthma, but instead noted that his behavior interfered with his school performance.  [R108-09]. Third, the state agency doctors were also of the opinion that Plaintiff's asthma provided less than marked limitations.  [R319, 326].  Fourth, the medical record shows that Plaintiff suffered from asthma, but the record does not indicate that the asthma was so limiting on his health or well being as demonstrated by the hearing testimony that

---

[21]     The Commissioner views asthma to be an episodic condition, *i.e.*, one with periods of worsening (exacerbation) and remission.  Given the nature of asthma, the Commissioner "consider[s] the frequency and duration of exacerbations, as well as the extent to which they affect a child's ability to function physically."  SSR 09-8p.

Plaintiff played outside, rode his bike, and participated in gym class.  [R385, 389-90, 395-96].  This evidence, all of which the ALJ cited in his decision, is substantial evidence supporting the ALJ's conclusion that Plaintiff was less than markedly limited in the domain of health and physical well-being.

Plaintiff's mother's testimony about three to four emergency room visits a year for asthma is not borne out by the record because as explained by the Commissioner, the recent records do not reflect frequent hospitalizations for asthma.  [*See* Doc. 18 at 11-12].[22]  Additionally, the testimony about Plaintiff's use of the nebulizer does not alter the substantial evidence analysis.  As a result, the Court finds no error in the ALJ's health and well-being finding.  *Cf. Williams v. Astrue*, No. 2:07-cv-844, 2008 U.S. Dist. LEXIS 43562, *10-11 (N.D. Ala., June 3, 2008) ("The mere fact that [plaintiff] has asthma and cannot be outside for extended periods of time is insufficient to support a finding that he has an extreme or even marked limitation in the area of health and physical well-being.").

---

[22]      The Court has found that Plaintiff went to the Newton Hospital for asthma and/or breathing problems as follows: (1) once in 1997 [*see* R112]; (2) four times in 1998 [*see* R121, 131, 141, 149]; (3) twice in 2001 [R169, 186]; (4) once in 2002 [*see* R233]; and (5) twice in 2004 [R261, 280].  There is no evidence of hospital visits concerning asthma or breathing problems for the other years - - 1999, 2000, 2003, and 2005-2008.

48

Unlike Plaintiff's arguments about the health and well-being domain, the Court concludes that the ALJ erred in considering the moving about and manipulating objects domain ("moving about domain"[23]).  This domain considers how a plaintiff moves his body from one place to another and how he moves and manipulates things, *i.e.*, it is concerned with "gross and fine motor skills."  20 C.F.R. § 416.926a(j).  In other words, the Commissioner considers "how well children can move their own bodies."  SSR 09-8p.  Moving the body involves the following different kinds of actions:

> Rolling your body; rising or pulling yourself from a sitting to a standing position; pushing yourself up; raising your head, arms, and legs, and twisting your hands and feet; balancing your weight on your legs and feet; shifting your weight while sitting or standing; transferring yourself from one surface to another; lowering yourself to or toward the floor as when bending, kneeling, stooping, or crouching; moving yourself forward and backward in space as when crawling, walking, or running, and negotiating different terrains (e.g., curbs, steps, and hills).

*Id.* § 416.926a(j)(1)(i).  These actions require varying degrees of strength, coordination, dexterity, pace, and physical ability to persist at the task.  *Id.* § 416.926a(j)(1)(iii).  At the preschool level (3 years to 6 years), a child "should be able to walk and run with ease."  *Id.* § 416.926a(j)(2)(iii).  School age children (6 years to 12 years) will "enjoy

---

[23]     There is no argument that Plaintiff was limited in his ability to manipulate objects and the medical record does not reflect such a limitation.  As a result, the Court only considers the moving about aspect of this domain, hence the Court's abbreviated label for the domain.

49

a variety of physical activities, such as running and jumping, and throwing, kicking, catching and hitting balls." *Id.* § 416.926a(j)(2)(iv).  Asthma can impose limitations on child in the moving about domain.  *Cf. Morris v. Barnhart*,  No. 02 CIV. 0377 AJP, 2002 WL 1733804, *9 (S.D.N.Y. July 26, 2002) (upholding ALJ's decision that five-year-old claimant's mild asthma was not disabling where asthma did not seriously interfere with "motor functioning" and was thus not a marked limitation).

Substantial evidence does not support the ALJ's finding that Plaintiff had no limitations in his ability to move about.  The sole basis for the ALJ's conclusion was the statement from the two state agency doctors who found that Plaintiff was not limited in this domain.  [*See* R20; *see also* R316-21 (state agency doctor with illegible name); R322-27 (state agency Dr. Munnis)].  The Court is aware that the ALJ must consider these state agency doctors' findings.  *See* 20 C.F.R. § 416.927(f)(2) (The ALJ "will consider opinions of State agency medical . . . consultants[.]"); *id.* § 416.927(f)(2)(i) (The ALJ "must consider findings of State agency . . . consultants[.]").  The ALJ evaluates these opinions by examining, *inter alia*, the supportability of the opinion, the consistency of the opinion with the record, the specialization of the medical source, the amount of understanding of the disability

50

program, the extent of familiarity with the record.  *See* 20 C.F.R. § 416.927(f)(2)(ii);

*see also id.* § 416.927(d)(3)-(6).[24]

Although the ALJ must consider these state agency opinions, the opinions in this

case do not constitute substantial evidence because as the following discussion

demonstrates these opinions: (1) were rendered three years prior to the ALJ's decision;

and (2) were without the benefit of testimony and newer evidence, suggesting that

Plaintiff had limitations in his ability to move about.

As for the evidence of limitations in moving about, the Court initially notes that

Plaintiff was consistently diagnosed with asthma prior to and throughout the relevant

---

[24]     The Eleventh Circuit has concluded that a state agency doctor's decision cannot serve as substantial evidence to support the ALJ's decision.  *See Spencer on behalf of Spencer v. Heckler*, 765 F.2d 1090, 1094 (11ᵗʰ Cir. 1985) ("[R]eports of physicians who do not examine the claimant, taken alone, do not constitute substantial evidence on which to base an administrative decision.").  This conclusion has come, however, in the context of an ALJ crediting a state agency doctor over a treating or examining doctor.  *See Edwards v. Sullivan*, 937 F.2d 580, 584 (11ᵗʰ Cir. 1991); *Spencer*, 765 F.2d at 1094.  As such, there may be situations where these opinions might constitute substantial evidence in support of the ALJ's decision.  *See Brandt v. Astrue*, No. 5:09-cv-97, 2010 WL 746446, *7 & n.25 (M.D. Fla. Mar. 3, 2010) ("State agency medical consultants are considered experts in disability evaluation, and their opinions may provide substantial evidence to support a finding of no disability.") (citing 20 C.F.R. § 404.1527(f)(2); SSR 96-6p).  The Court does not make any definitive conclusion on this issue and cites the *Brandt, id.*, decision for illustrative purposes only.  Instead, as explained *infra*, this case does not provide an instance where the non-examining doctors' opinions could constitute substantial evidence because they were based on an incomplete record.

51

period and was prescribed medication for the asthma.  [*See, e.g.*, R309 (diagnosis of asthma in May 1998); 305 (February 1999), 301 (February 2000), 169 (May 2001 ER visit for acute asthma episode); 233-40 (September 2002 hospital stay for asthmatic exacerbation), 293 (September 2004); 330 (July 2005); 333 (November 2005); 340 (March 2006); 342 (January 2007); 345 (January 2008)].  The evidence suggested that this asthma interfered with a number of activities involving moving about.  His teacher indicated that Plaintiff's asthma caused shortness of breath on cold, windy days and Plaintiff would miss some morning work because of breathing treatments, suggesting that his asthma interfered with his moving about by interfering with his ability to persist at these tasks.  [*See* R70].  There is also evidence that Plaintiff's activities in playing outside, climbing stairs, playing sports, and engaging in physical education class were interrupted by Plaintiff's asthma.  [R380-81, 385, 386, 389, 395-96].  As a result, this evidence shows that Plaintiff's asthma interferes with his "physical ability to persist at the task."  20 C.F.R. § 416.926a(j)(1)(iii); *cf. Morris*, 2002 WL 1733804 at *9 (finding evidence supported ALJ finding that plaintiff had slight limitation in motor functioning from asthma given that it limited the ability to perform exertional activities).

The two state agency doctors found no limitations in this domain in 2005, but these findings were made nearly three years before the ALJ's decision and without the

52

benefit of reviewing the medical records from July 2005 to 2008 or evidence similar to Plaintiff's testimony.  The ALJ did not explain why this later evidence was irrelevant to the agency doctor's findings.  Given this other evidence suggesting limitations in Plaintiff's ability to move about, the Court concludes that the ALJ's sole reliance on state agency doctors without resolving how the later evidence was consistent with these opinions was error.  *See Shinn ex rel. Shinn*, 391 F.3d at 1287 (rejecting reliance on two state agency opinions where the opinions were "based on woefully incomplete evidence" in that they were made without knowledge of testimony by plaintiff's mother about her condition); *O'Neal v. Astrue*, No. 5:08-cv-322, 2010 WL 431868, *8 (N.D. Fla. Feb. 2, 2010) (finding non examining doctor's opinions were entitled to little weight where they were not based on a record containing evidence relevant to a full and proper evaluation of plaintiff's abilities); *Lumpkin v. Barnhart*, 485 F. Supp. 2d 1270, 1282 (S.D. Ala. 2006) ("[T]he opinion of the non-examining medical examiner cannot be given any value in that it was given based on the evidence that . . . represents, at most, only half of the record evidence.").[25]

---

[25]     Although the ALJ found these state agency opinions were supported by the overall evidence, [R17],  this additional finding does not ameliorate the ALJ's error because as discussed in the main text, the opinions did not consider evidence of asthma's limiting effects.  The Court recognizes that other courts have concluded in some instances that where the ALJ relies on non-examining doctors and makes the

As for the Commissioner's argument that evidence from the Function Report and the hearing testimony about Plaintiff's gym class activities supports the ALJ's decision, the undersigned is unpersuaded. First, the ALJ did not cite to this evidence and relied solely on the non-examining doctor's opinions, thereby making these arguments impermissible post-hoc rationalizations. *See Jamiah v. Astrue*, No. 1:09-cv-1761, 2010 U.S. Dist. LEXIS 50396, *54-55 (N.D. Ga. May 17, 2010) (citing cases for the proposition that post hoc justifications of agency decision is impermissible).

Second, even if this evidence falls within the ALJ's catchall statement that the non-examining doctors' opinions were "consistent with the totality of the evidence"

_____

additional finding that these doctors' opinions were consistent with the medical evidence, the non-examining doctors' opinions can constitute substantial evidence. *See Gibson v. Astrue*, No. 5:08-cv-370, 2009 WL 5067757, *10 (M.D. Fla. Dec. 15, 2009) (rejecting plaintiff's argument that non-examining doctor's opinion was entitled to little weight because 'the ALJ found that the non-examining state agency doctor's opinions were consistent with the "medical evidence as a whole" '); *Jones v. Astrue*, No. 5:07-cv-347, 2009 WL 2602283, *4 (M.D. Ga. Aug. 20, 2009) ("The opinions of the two state agency physicians were consistent with the medical records and sufficient to weigh as 'substantial evidence'[.]"); *Chieffo v. Astrue*, No. 8:08-cv-710, 2009 WL 2044675, *6 (M.D. Fla. July 10, 2009) ("[T]he Commissioner is correct that an ALJ may rely on the opinions of non-examining doctors when the opinions are supported by other evidence of record."). The Court identifies these cases solely as illustrative examples concerning how some courts treat state agency doctor opinions, but finds that the non-examining doctors' opinions from this case are insufficient. These cases are inapplicable because the ALJ's finding of consistency does not account for the evidence that Plaintiff's asthma interfered with Plaintiff's ability to persist at various tasks involving motor skills.

[R17], the Court is unpersuaded.  The move about domain examines not only a child's ability to perform activities such as walking and other gross motor skills, but also examines the "physical ability to persist at the task."  20 C.F.R. § 416.926a(j)(1)(iii). As noted above, evidence suggests that Plaintiff's ability to persist in performing tasks requiring gross motor skills was compromised by his asthma.  The ALJ's decision does not account for this evidence.  As a result, the Court is unpersuaded by the Commissioner's argument, and the state agency doctor's opinions cannot account for this evidence because it was not in the record in 2005 when the state agency doctors made their findings.

Accordingly, the Court concludes that the ALJ **ERRED** in solely relying on state agency doctors to determine that Plaintiff had no limitations in the domain of moving about.

55

The Court also has considered whether it could conclude whether this error is

harmless.[26, 27]   A claimant will be disabled if his impairment functionally equals the

---

[26]      The Eleventh Circuit employs harmless error analysis in evaluating the Commissioner of the Social Security Administration's final decisions to deny Social Security disability benefits.  *Newsome ex rel. Bell v. Barnhart*, 444 F. Supp. 2d 1195, 1201 (M.D. Ala. 2006) (citing *Miller v. Barnhart*, 182 Fed. Appx. 959, 960 (11th Cir. May 31, 2006)).

[27]      By stating that the record does not demonstrate harmlessness, the Court is not dictating to the Commissioner the result to be found upon remand.  Other cases have found the claimant's asthma to not be an extreme limitation in the domain of moving about.  *Cf. Lavigne ex rel. F.L. v. Barnhart*, No. 7:05-cv-43, 2006 U.S. Dist. LEXIS 5012, *16 (W.D. Va. Feb. 8, 2006) (noting that while asthma and diabetes had "somewhat impact[ed plaintiff's] ability to exercise, such impairments fail to rise to the level of 'marked' limitations in the fourth domain").  Other cases have concluded that any error to in evaluating the domain of moving about was harmless where no evidence suggested that the limitation was extreme and the plaintiff did not successfully argue that he suffered marked limitations in any other domain.  *See Buckhanon ex rel. J.H. v. Astrue*, No. 09-1633, 2010 WL 292741, *5 (7th Cir. Jan. 26, 2010) (holding that error was harmless where the evidence "suggest[ed] only a 'marked' limitation, not an 'extreme' one, so a remand would help only if [plaintiff] could point to a second with marked limitations, which she cannot."); *Patterson ex rel. TJP v. Comm'r of Soc. Sec.* No. 09-cv-11621, 2010 WL 2218629, *4 (E.D. Mich. May 6, 2010) (R&R) (finding harmless error in evaluating domain "because only one 'marked' limitation does not establish that claimant functionally met the Listing."); *Brunner ex rel. Ellis v. Astrue*, Civ. Action No. 08-56, 2009 WL 734712, *8 & n.6 (W.D. Pa. Mar. 19, 2009) (finding harmless error where one marked limitation would not establish disability and where plaintiff never argued plaintiff had an extreme limitation in the domain); *Holloway v. Astrue*, No. 1:08-cv-1247, 2009 WL 305127, *8 (N.D. Ga. Feb. 9, 2009) (King, M.J.) (concluding ALJ's error in evaluating one domain of life was harmless error where substantial evidence did not support marked or extreme limitation in domain); *Wood v. Astrue*, No. 2:07-cv-720, 2008 WL 4571784, *4 (M.D. Ala. Oct. 14, 2008) (finding harmless error in domain of acquiring and using

listings.  20 C.F.R. §§ 416.924(a), 416.926a(a).  Functional equivalence exists if the impairment results in marked limitations in two domains of functioning or an extreme limitation in one domain.  *Id.* §  416.926a(a), (d).  A marked limitation in a domain exists when the impairment "interferes seriously with [the claimant's] ability to independently initiate, sustain, or complete activities."  *Id.* § 416.926a(e)(2); *see also Reid v. Astrue*, No. 07-61051-CIV, 2009 WL 368656, *18-19  (S.D. Fla. Jan. 8, 2009) (holding that any limitation in any domain, including the area of moving about and manipulating objects, that interferes "seriously" with the ability independently to initiate, sustain or complete activities, constitutes a marked limitation) (citations omitted).  An extreme limitation in a domain exists when the impairment "interferes very seriously with [the claimant's] ability to independently initiate, sustain, or complete activities.  *Id.* § 416.926a(e)(3).[28]

―――――――――――――

information where plaintiff did not contest other domains and the evidence of record did not support a finding of an extreme limitation in this domain).  As stated *infra* at 59-60, this is a determination best left initially to the Commissioner.

[28]    The Commissioner's regulations describe an extreme limitation as follows:

(i) We will find that you have an "extreme" limitation in a domain when your impairment(s) interferes very seriously with your ability to independently initiate, sustain, or complete activities.  Your day-to-day functioning may be very seriously limited when your impairment(s) limits only one activity or when the interactive and cumulative effects of your

AO 72A
(Rev.8/8
2)

Since Plaintiff's brief was successful in identifying only one error in the domain

_____

impairment(s) limit several activities. "Extreme" limitation also means a limitation that is "more than marked." "Extreme" limitation is the rating we give to the worst limitations. However, "extreme limitation" does not necessarily mean a total lack or loss of ability to function. It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least three standard deviations below the mean.

(ii) If you have not attained age 3, we will generally find that you have an "extreme" limitation if you are functioning at a level that is one-half of your chronological age or less when there are no standard scores from standardized tests in your case record.

(iii) If you are a child of any age (birth to the attainment of age 18), we will find that you have an "extreme" limitation when you have a valid score that is three standard deviations or more below the mean on a comprehensive standardized test designed to measure ability or functioning in that domain, and your day-to-day functioning in domain-related activities is consistent with that score. (See paragraph (e)(4) of this section.)

(iv) For the sixth domain of functioning, "Health and physical well-being," we may also consider you to have an "extreme" limitation if you are frequently ill because of your impairment(s) or have frequent exacerbations of your impairment(s) that result in significant, documented symptoms or signs substantially in excess of the requirements for showing a "marked" limitation in paragraph (e)(2)(iv) of this section. However, if you have episodes of illness or exacerbations of your impairment(s) that we would rate as "extreme" under this definition, your impairment(s) should meet or medically equal the requirements of a listing in most cases. See §§ 416.925 and 416.926.

20 C.F.R. § 416.926a(e)(3).

58

of moving about, there must be evidence to suggest an extreme limitation in this domain. The moving about domain "consider[s] how well children can move their own bodies and handle things." SSR 09-8p. It is therefore focused on fine and gross motor skills. 20 C.F.R. § 416.926a(j). As discussed above, the evidence of limitations in Plaintiff's motor skills derives solely from Plaintiff's ability to persist at tasks involving motor skills due to his asthma.

While Plaintiff's limitation in the moving about domain is unlike any of the examples of limited functioning offered by the regulations, *see* 20 C.F.R. § 416.926a(j)(3), the record evidence simply does not conclusively show that Plaintiff did not suffer from an extreme limitation in the domain of moving about. For example, Plaintiff's mother testified that he had asthma attacks as a result of his family's living on a top floor of an apartment, causing his doctor to suggest that they move to a residence that did not involve his going up and down stairs. [R385-86]. When they moved to a house, they had to remove the carpet in most of the rooms and dust every day. [R386]. Plaintiff further testified that he has to use his pump or take pills on a daily basis when he is tired or runs or moves a lot. [R397]. While there is other evidence which indicates that Plaintiff participates in physical education class activities, [*see e.g.,* R395], which points more to a marked or less than marked limitation, the

59

Court concludes that the Commissioner, and not the undersigned, is in the best position to initially resolve whether Plaintiff satisfies the extreme limitation in the domain of moving about.

As a result, the Court finds that the ALJ **ERRED** in evaluating whether Plaintiff has a limitation in the domain of moving about.  Further, the Court cannot conclude that such error was harmless, and therefore this matter must be remanded to the Commissioner for further consideration of Plaintiff's claims.

> C.      *Appeals Council and New Evidence*

Plaintiff argues that the Appeals Council erred by failing to remand the case for the ALJ to consider the evidence of disciplinary records, which Plaintiff claims is evidence of a severe psychological impairment.  [Doc. 17 at 18].  Plaintiff asserts that these records corroborated the concerns about Plaintiff's behavioral problems outlined in the report cards and his mother's testimony.  [*Id.* at 19].

The Commissioner responds that even with the additional evidence before the Appeals Council, the substantial evidence supports the final decision.  [Doc. 18 at 14]. The Commissioner notes that the additional evidence of behavioral problems did not establish that a medically determinable impairment existed or that there were additional functional limitations.  [*Id.*].

AO 72A
(Rev.8/8
2)

In *Ingram v. Comm'r of Social Security*, the Eleventh Circuit clarified how federal courts were to consider evidence presented for the first time to the Appeals Council. The Court held that a "court must consider evidence not submitted to the [ALJ] but considered by the Appeals Council when that court reviews the Commissioner's final decision." *Ingram*, 496 F.3d 1253, 1258 (11th Cir. 2007). "[W]hen a claimant *properly presents new evidence* to the Appeals Council, a reviewing court must consider whether that new evidence renders the denial of benefits erroneous." *Id.* at 1262 (emphasis added). To determine whether the new evidence would make the ALJ's denial of benefits erroneous, the court must "determine whether the Appeals Council correctly decided that the '[ALJ's] action, findings, or conclusion is [ ] contrary to the weight of the evidence currently of record." *Id.* at 1266-67 (quoting 20 C.F.R. § 404.970(b)[29]).

As noted, the *Ingram* case requires that "a claimant properly presents new evidence to the Appeals Council." *Ingram*, 496 F.3d at 1262. The Commissioner's regulations indicate that evidence is "properly present[ed]" to the Appeals Council if it meets two requirements. First, the evidence must be "new and material." 20 C.F.R.

---

[29]    This provision from the CFR applies to the disability insurance benefits claims, but the CFR contains the exact same provision for supplement security income claims at 20 C.F.R. § 416.1470(b). As a result, *Ingram* is applicable to the instant case.

AO 72A
(Rev.8/8
2)

§ 416.1470(b).  Second, the evidence must "relate[] to the period *on or before* the date of the [ALJ] hearing decision."  *Id.* (emphasis added).  If evidence does not meet these two requirements, the Appeals Council will not err when denying review of an appeal because it was not "properly present[ed]" pursuant to the requirements of 20 C.F.R. § 416.1470(b).  *See Smith v. Social Security Admin.*, 272 Fed. Appx. 789, 800-802 (11th Cir. Apr. 3, 2008) (finding no error in the Appeals Council's decision not to review the ALJ's decision where new evidence was not new and material and/or did not relate to the period on or before the ALJ's decision).

The Court concludes that the Appeals Council did not err in failing to remand the case to the ALJ to consider Plaintiff's behavioral problems for three separate and distinct reasons.  First, the new evidence was not relevant to the period on or before the ALJ's decision.  The evidence submitted to the Appeals Council constituted school disciplinary records dated September and October 2008.  [*See* R5, R374D-374G].  The ALJ's decision was issued, however, on June 27, 2008, which is between three and four months before the new evidence existed.  As a result, the new evidence did not relate to the period on or before the date of the ALJ's decision.  *See* 20 C.F.R. § 404.1470(b).  The Appeals Council therefore did not err by failing to remand the case based on the new evidence.  *Smith*, 272 Fed. Appx. at 801-802 (holding that while medical reports

would have strengthened plaintiff's claim, "these reports came after the ALJ's decision and, therefore, the [Appeals Council] does not consider them in determining whether to review the ALJ's decision").

Second, the evidence was not "material." New evidence is material if it "is 'relevant and probative so that there is a reasonable possibility that it would change the administrative result.' " *Robinson v. Astrue*, No. 09-12472, 2010 WL 582617, *3 (11th Cir. Feb. 19, 2010) (quoting *Milano v. Bowen*, 809 F.2d 763, 766 (11th Cir. 1987)). As explained above, the Commissioner requires evidence from acceptable medical sources to establish the presence of an impairment. *See* 20 C.F.R. § 416.913(a). Here, there is no evidence of a mental impairment diagnosis from an acceptable medical source. The evidence of Plaintiff's school discipline cannot establish that such an impairment exists, but instead only can serve as evidence concerning the severity of any such mental impairment. *See* 20 C.F.R. § 416.913(d)(2). Plaintiff claims, however, that the disciplinary records are evidence of a mental impairment. This position is problematic because the records cannot establish the existence of an impairment and the ALJ was never asked to consider a mental impairment. As a result, the school discipline records would not reasonably have changed the administrative result because

63

these records were not relevant to the only documented impairment in the record - - Plaintiff's asthma.

Finally, even if the evidence were material and relevant to the period before the ALJ's decision, the Court would conclude that the Appeals Council correctly concluded that the ALJ's "action, findings, or conclusion [was not] contrary to the weight of the evidence currently of record." *See* 20 C.F.R. § 416.1470(b).  As explained above, Plaintiff only sought disability benefits based on his asthma, and he did not notify the ALJ that he sought to include mental impairments in his application for disability benefits.  Also, the hearing testimony about behavioral problems did not put the ALJ on notice that the ALJ was to constructively amend the disability application to include unidentified and undiagnosed mental impairments.  Without any record evidence of mental impairments and without any request that such impairments serve as a basis for disability before the ALJ, the Appeals Council correctly determined that the ALJ's action and conclusions were not contrary to the weight of the record evidence because there was no medically determinable finding of a mental impairment in the record.

Accordingly, the Court concludes that the Appeals Council **DID NOT ERR** in failing to remand the case to the ALJ to consider the new evidence of school discipline reports.

64

AO 72A
(Rev.8/8
2)

## VII.   CONCLUSION

For the reasons discussed above, the Court **REVERSES AND REMANDS** the final decision of the Commissioner.  The Clerk is **DIRECTED** to enter judgment in Plaintiff's favor.

**IT IS SO ORDERED AND DIRECTED**, this the 23rd day of September, 2010.

_____
**ALAN J. BAVERMAN**
**UNITED STATES MAGISTRATE JUDGE**

AO 72A
(Rev.8/8
2)